E. T. RICHARDS et al., Appellees, v. F. L. CROSBY et al., Appellants.

**TROVER AND CONVERSION:** Evidence—Sufficiency. Evidence
1   reviewed, and held sufficient to establish a rescission of a contract of sale, and that, consequently, the note given for the purchase price thereupon became the property of the maker thereof, and was converted by the former payee and his coconspirator to their own use.

**CONSPIRACY:** Civil Liability—Acts Constituting Conspiracy.
2   Principle recognized that one who aids and abets another in the accomplishment of an unlawful purpose is liable to the injured party as a principal.

**TRIAL:** Instructions—Form, Requisites and Sufficiency—Correct
3   But Inexplicit—Waiver. Principle recognized that the lack of fullness and explicitness in a correct instruction is waived by failure to request the giving of the more explicit instruction.

*Appeal from Linn District Court.*—MILO P. SMITH, Judge.

SATURDAY, MAY 19, 1917.

ACTION against defendants for the alleged conversion of a promissory note. Trial to a jury, and a verdict and judgment against both defendants. The defendant William Crosby appeals.—*Affirmed.*

*F. L. Anderson,* for appellant.

*Voris & Haas,* for appellees.

PRESTON, J.—A number of questions are
1. TROVER AND CONVERSION: evidence: sufficiency. assigned as error, some of which appellees contend were not properly raised in the district court; but it seems to be conceded by

both sides that there are two main questions presented here
for determination: First, as to whether there is evidence
sufficient to go to the jury and to sustain the finding as to
the alleged conversion of the note by the defendant Wil-
liam Crosby; and in regard to Instruction No. 4. These
will be taken up first, and the other questions briefly refer-
red to later.

1. The theory upon which plaintiff presented his case
is substantially this: That defendant sold plaintiff a span
of mules under a warranty, and that there was a breach of
the contract justifying a rescission of the sale, and that
there not only was ground for rescission, but that there was
in fact a rescission, by which the plaintiffs and the defend-
ants agreed that the mules should be returned to the defend-
ants, and that the $425 note given by plaintiffs to the defend-
ants for the mules should be returned to plaintiffs; that
the mules were returned, but that the defendants refused
to turn back the note; that plaintiffs were the owners and
entitled to the possession of said note, and commenced a re-
plevin suit to recover the possession thereof, but that de-
fendants entered into a conspiracy to prevent plaintiffs
from recovering their note, and that, acting together, de-
fendant William aiding and abetting his codefendant, they
fraudulently converted said note and negotiated it to an
innocent holder; and that F. L. Crosby fraudulently con-
veyed other property of his to appellant and attempted to
conceal it from attachment, and fraudulently aided and
assisted William Crosby to defeat the just claim of plaintiffs
by concealing said property and escaping from the jurisdic-
tion of the courts of Iowa; that thereafter, plaintiffs were
compelled to pay the note to the transferee. They asked to
recover the damages sustained by them by reason of the
wrongful acts of the defendants.

There appears to be but little dispute as to the facts
down to the time when the mules were returned to defend-

ants and a demand made for the note. While the evidence is in conflict at some points, the jury could have found the facts to be substantially as we shall state them. It is thought by appellant that there is no dispute as to what took place thereafter, while appellees contend that the circumstances were such and so unusual and out of the ordinary that the inferences to be drawn from all the facts and circumstances are such that different conclusions might be reached by reasonable men, and that, on this appeal, the evidence must be given the strongest interpretation in favor of the plaintiffs, and that, under these rules, the case was propertly submitted to the jury, and that the verdict is sustained by the evidence. A contention of appellant's is that the court permitted a recovery against F. L. Crosby on breach of contract and against William Crosby for tort, but we do not so understand the record.

Plaintiffs, father and son, live at Prairieburg, in the northeastern part of Linn County. Defendant F. L. Crosby, is a resident of Mexico, Missouri, and appellant, William, is his nephew, and a resident of Prairieburg. About March 1, 1915, F. L. Crosby shipped a carload of mules, 18 or 20 head, from his home in Mexico, Missouri, to William Crosby at Prairieburg for sale. This was prearranged between the Crosbys, and William rented a livery barn, where he took the mules upon their arrival. The evidence tends to show that F. L. Crosby did not arrive in Prairieburg until a day or two before the sale of the span of mules in question to plaintiffs. This sale of the mules was on March 30th, and plaintiffs gave their note for $425, due in six months, with 8 per cent interest. The testimony shows that the note was good. Between the time of the arrival of the mules, early in March, and the arrival of F. L. Crosby, the latter part of March, William was selling and trading the mules about Prairieburg. From appearances to third persons, William might have been handling the mules

on his own account, but he testifies that he was to have a commission of $5 on each mule sold within 30 days. In the early part of March, plaintiffs, or one of them, first began negotiations with appellant, William Crosby, for the span of mules in question, and it is stated that defendant warranted the mules to be gentle and all right. We shall not go into the testimony as to whether the mules were as warranted. It is very clear from the testimony that they were not as warranted. There is testimony that, after they were tried, and the appellant, William Crosby, said to F. L., "Take them back to Missouri and make the man we got them of pay the freight both ways—they are guaranteed to us," it was agreed between the plaintiffs and the defendants that they would take the mules back; and that F. L. Crosby said to them, in the presence of appellant, William, to bring the mules back in the morning and get their paper; that plaintiffs did as agreed, and the next day returned the mules to the Crosby barn at Prairieburg. Defendants were both present, and they tied the mules in the barn. Then the Crosbys told plaintiff that they would take the mules back if he would give them $25. This, plaintiff refused, and demanded the surrender of the note, and was informed that the note would not be surrendered. Appellant, William, was present, and took part in the conversation. This was about noon. Plaintiff, not being able to get his note, went to the bank and telephoned an attorney. A relative of appellant's runs the telephone station in Prairieburg, and appellees' contention is that William got the information that plaintiff was talking to an attorney. Plaintiff started for the county seat, Marion, a little later, arriving there about two o'clock in the afternoon, and secured a writ of replevin for the note, and started back with the sheriff. Plaintiff says it was a little after noon when he left Prairieburg to go to Marion. About the time plaintiff started from Prairieburg to Marion, the defendants engaged one Ed Fish to

take them to Monticello, in Jones County, 12 miles east of Prairieburg, where F. L. Crosby was to take a train to Missouri, and defendants left for Monticello about 2 o'clock, arriving there about 3:30. Appellant, William, engaged the auto shortly after dinner. Defendants drove directly to a bank in Monticello, and both went into the bank. According to the testimony of appellant himself, he had no business to go to Monticello for at the time in question, and he says that he only went into the bank because they stopped in front of it, and says also that he did not know why he went into the bank. He also says that he had no business at the attorney's office, where they went soon after. Defendant F. L. Crosby sold the note at the bank, and then defendants went directly to the office of a lawyer, and, after consulting him, appellant, William Crosby, executed a note to his uncle, F. L., for $1,000, due on demand, and without any security, and claimed to have bought all of F. L. Crosby's stock remaining at Prairieburg except one team. A few minutes thereafter, this team was traded to Fish, the auto driver, for Fish's automobile, and Fish testifies that he and F. L. Crosby negotiated for the last span of mules for about five minutes. After the trade, F. L. Crosby went to the automobile and looked it over to see that it was all right, and accepted it, according to the testimony of Fish, who says also that the mules he traded for at Monticello were in the barn used by Crosby at Prairieburg, but when he got home, the mules were in his barn. Although appellant claimed to have bought the property of F. L. Crosby, he was making arrangements, the same afternoon, to ship the stock back to Missouri. According to the testimony of Fish, the parties left Monticello about 4:30 that afternoon, and he and F. L. drove the auto to Cedar Rapids, where F. L. took supper, and then went on with the car to Missouri. They did not go back to Prairieburg, but took a road that carried them south of that town. There is

testimony tending to show that, on the way, they met a party and arranged to inspect the horses and mules appellant was intending to ship to Missouri on the following Monday—the stock he claimed to have just bought; but he did not ship the property, and he says the reason he did not was because of plaintiffs' attachment of two mares, although, under the testimony, these two were released on the same Monday.

After plaintiff had obtained his writ of replevin, and found that F. L. had gone, he learned, the next day, April 2d, that the note had been sold; and on that date, plaintiff, not knowing of the transfer of the property to William, again went to Marion and commenced this action against F. L. Crosby and secured a writ of attachment, and again went to Prairieburg. According to the testimony of some of the witnesses, the plaintiff was then informed by appellant, William Crosby, that he had bought all of his uncle's property, and admitted the sale of the note. Plaintiff testifies that, at the time the sheriff levied the writ of attachment, he talked with appellant and asked him what their hurry was to get rid of the note, and that appellant, William Crosby, then said, "We knew that you would stop payment on that note;" and witness then asked appellant, "What was the old man's hurry in leaving for Missouri at midnight?" and he said, "We knew if you got hitched on here, he would have to stand trial here, and if he got to Missouri, you would have to commence suit in Missouri, and we could put the case off, and we could wear you out and beat you that way." He says other witnesses were present and heard this conversation, and that the sheriff then asked, "Do you think that is the right way to do?" and that Crosby answered that he thought it was. Appellant testifies that the attorney advised F. L. Crosby, if he could not make a settlement with plaintiffs, to go home where his

home was, and when plaintiff got ready to settle, he would know where to find him; and that, after that advice was given, he bought all the property F. L. Crosby had except one team. No bill of sale was made to William Crosby of the remaining animals.

These are some of the circumstances which we cull from the record bearing upon the question as to whether appellant had knowledge of the purposes of F. L. Crosby, and whether he aided and abetted him in the conversion of the note and disposition of the property to defraud plaintiffs. Appellant picks out some of the circumstances, and says that such are not enough to make appellant liable, or to take the case to the jury. But we think it is proper to take into consideration all the circumstances shown in the record as bearing upon the relations between the two Crosbys, and to our minds, the entire record makes it a question for the jury as to the liability of William Crosby, and the jury was justified in finding that the Crosbys were acting together, and that appellant participated in the conversion of the note.

But little authority is cited by appellant on this proposition, but appellee cites, on the question of conspiracy, that any act done in furtherance of the common design becomes the act of all, and each conspirator is responsible for such act, and also that the act of all in engaging in, advising, encouraging, aiding or abetting the commission of a tort makes each one jointly and severally liable therefor. Some of the cases cited on this proposition are: 8 Cyc. 657; 1 Cooley on Torts (3d Ed.) 211, 223, 244; *Moore v. Fryman,* 154 Iowa 534, at 537. Appellee also cites 38 Cyc. 2054, and other cases, to the proposition that one who joins in and knowingly assists in the conversion of chattels is liable for the tort, even though he receives no direct benefit therefrom, and even though he acted as agent for another. See also *Starr v. Bankers' Union,* (Neb.) 116 N. W. 61; *Wing v. Milliken,*

(Me.) 40 Atl. 138. And that in torts the relation of principal and agent does not exist; they are all wrongdoers, and equally liable as principals, citing, among other cases, *Carraher v. Allen,* 112 Iowa 168, 173; *Warder-Bushnell Co. v. Harris,* 81 Iowa 153. Also, 38 Cyc. 2087, and *Bowe v. Palmer,* (Utah) 102 Pac. 1007, to the point that the connection of defendant with a conversion was sufficiently shown by proof of any facts or circumstances which will justify an inference that he assisted in wrongfully taking the goods, shared in the proceeds thereof with guilty knowledge, or participated in some act which in law amounted to a conversion.

2. CONSPIRACY: civil liability: acts constituting conspiracy.

2. Instruction No. 4 is quite lengthy, covering nearly two pages of the printed abstract. It is substantially as follows: The first part informs the jury that, if they find the warranty substantially as alleged, and that there was a breach, plaintiffs would be entitled to recover of F. L. Crosby the amount of the note given, with interest; or, if the jury should find that, after a trial of the mules, plaintiffs informed defendants that the mules were balky and vicious and bad kickers and not as warranted, and defendants agreed to take them back and surrender the note, then plaintiffs would be entitled to recover against defendant F. L. Crosby; and then states, in substance, that, if the jury should find that defendant F. L., shortly after refusing to deliver the note, proceeded to make the sale of it, placed it in the hands of an innocent purchaser, and then sold all of his property in Linn County and at once left the state, with intent to delay and defeat plaintiffs in collecting from him or his property the amount of the note, and thus to cheat and defraud plaintiffs, and the defendant William Crosby knew his codefendant's purpose in concealing the note and disposing of the property to be to defraud the plaintiffs, and aided and abetted him in the scheme, then he is

equally liable with F. L. Crosby, and they should find against him, as well as against F. L., to the amount of the promissory note, with interest. But if the jury should fail to find that appellant William Crosby in any way aided or abetted F. L. in getting rid of his property here and in selling the note, then their verdict should be in his favor. But the mere fact that appellant bought some of the animals .of his uncle would not of itself alone render him liable, but is a circumstance for them to consider in connection with other· facts in the case.

3. TRIAL: instructions: form, requisites and sufficiency: correct but inexplicit: waiver.

Appellant's objections, as now made, to this instruction are that plaintiffs had no lien on the note and no legal title to it, and that they had no lien, title, interest or claim to the other animals, and that there was no testimony showing that defendant knew of his uncle's intentions with respect to the sale of the note, and no testimony that he aided or abetted in the sale of the note, or in the sale of the team to Fish, and that mere advice by William to F. L. was not enough to make William personally liable.

Some of these matters have been referred to in a prior division of the opinion; that is, that, after the agreed rescission and return of the mules, the note would not belong to the defendants or either of them, and plaintiffs were entitled to the possession thereof. As to the other part, that there is no testimony showing that appellant knew of his uncle's intentions, and that he did not aid or abet in the sale of the note or team, we have already referred to this at considerable length, and held that there was evidence, and sufficient evidence, to justify the jury in so finding. This really is the more important point argued by appellant in his objections to this instruction. It is also said by appellant that a civil liability on the part of William cannot be predicated upon aiding and abetting, and that the

court should have defined more definitely the meaning of the words "aided and abetted."

Appellees contend that the exceptions taken by appellant at the trial to this instruction are not sufficient to raise the questions, or at least some of them, now argued. The exceptions taken at the trial are, substantially, that the note, under the circumstances, could not be the subject of conversion by either of the defendants; that the sale by F. L. Crosby of the remaining animals to William and Fish was not a conversion of any property upon which plaintiffs then had any lien or right. We think that some of the questions now argued in regard to this instruction are not covered by the exceptions taken at the trial. Some of the matters argued have been discussed to some extent in the general discussion of the evidence set out in the former paragraph of the opinion, and necessarily so. We may add that it is our opinion that Instruction No. 4, as applied to the evidence in this case, is in harmony with the cases in regard to conversion, hereinbefore referred to. Instruction No. 4 does not make appellant liable because of the sale of the remaining property to him. But the question was as to the conversion by appellant and F. L. Crosby, acting together, of the note, and the court permitted the other circumstances to be considered as bearing upon that question, and we think properly so.

Appellant offered instructions, but none of those offered defined "aiding and abetting," and we think that, in the absence of such request, the jury could not be misled by the use of the words themselves.

As to the first instruction asked by appellant, that appellant could not be held liable because of any breach of warranty in the contract for the sale of mules, etc., we do not understand the instructions to make appellant liable for that. The second and third were covered, we think, by those given by the court. The fourth instruction asked

was also covered. The instructions of the court did not authorize a recovery against appellant because of his acts or conduct after the sale of the note to the bank by F. L. Crosby. As stated, the court simply permitted other acts of the appellant and F. L. Crosby to be considered as bearing upon the main question of the conversion of the note, and whether they were acting together in their purposes and intentions, and knowledge of appellant and F. L. Crosby.

Some other questions have been argued, but we think they are not controlling, and there is a question as to whether they·were raised in the trial court.

It is our conclusion that there was no prejudicial error, and the judgment is, therefore,—*Affirmed.*

GAYNOR, C. J., WEAVER and STEVENS, JJ., concur.